# IN THE UNITED STATES DISTRICT COURT

# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MISTY GLEASON, | CASE NO. 3:14-cv-00021-GBC |
| Plaintiff, | |
| | (MAGISTRATE JUDGE COHN) |
| v. | MEMORANDUM |
| CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY, | Docs. 1, 9, 10, 14, 19, 24, 27 |
| Defendant. | |

## MEMORANDUM

## I.      Procedural Background

On October 22, 2007, Misty Gleason ("Plaintiff") filed as a claimant for

disability insurance benefits under Title II and XVI of the Social Security Act, 42

U.S.C. §§ 401-34, 1181-1183f, with a date last insured of December 31, 2005,[1] and

claimed a disability onset date of March 1, 1998.  (Administrative Transcript

---

[1] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. 42 U.S.C. §§ 415(a) and 416(i)(1). The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." *See* 42 U.S.C. § 416(i)(2); *accord Renfer v. Colvin*, No. 3:14CV611, 2015 WL 2344959, at *1 (M.D. Pa. May 14, 2015).

(hereinafter, "Tr."), 13, 15).

After the claim was denied at the initial level of administrative review, the Administrative Law Judge (ALJ) held a hearing on March 24, 2010.  (Tr. 40-80). On April 16, 2011, the ALJ found that Plaintiff was not disabled within the meaning of the Act.  (Tr. 91-102)).  On November 14, 2011, the Appeals Council remanded the case.  (Tr. 103-107).  On May 31, 2012, a second hearing was held before the ALJ.  On April 16, 2011 the ALJ again found that Plaintiff was not disabled within the meaning of the Act.  (Tr. 91-102). Plaintiff sought review of the unfavorable decision which the Appeals Council denied on November 29, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner.  (Tr. 1-6).

On January 8, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits.  (Doc. 1).  On March 13, 2014, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings.  (Doc. 9, 10).  On May 9, 2014, Plaintiff filed a brief in support of the appeal.  (Doc. 14 ("Pl. Brief")).  On

July 11, 2014, Defendant filed a brief in response.  (Doc. 19 ("Def. Brief")).  On

September 3, 2014, Plaintiff submitted a reply brief.  (Doc. 24 ("Pl. Reply")).  On

November 14, 2014, the Court referred this case to the undersigned Magistrate

Judge.   Both parties consented to the referral of this case to the undersigned

Magistrate Judge, and an order referring the case to the undersigned Magistrate

Judge was entered on November 25, 2014.  (Doc. 27.)

## II.   Relevant Facts in the Record

Plaintiff was born on October 13, 1975, and thus was classified by the

regulations as a younger person through the date of the ALJ decision rendered on

July 13, 2012.  20 C.F.R. § 404.1563 (c); (Tr. 70).  Plaintiff received a GED in

1994 and obtained certification as a certified nursing assistant in 1996.  (Tr. 281).

Plaintiff has been incarcerated on several occasions.  (Tr. 407, 512-513).  In 1996,

Plaintiff was charged with conspiracy due to her then husband using her car to

deliver marijuana, incarcerated in 1998 due to writing bad checks after her account

closed, and subsequently incarcerated due to alcohol-related violations of

probation.  (Tr. 45, 72-75, 407, 512-513).  Plaintiff reported that from October

1998 to October 2000 she was incarcerated.  (Tr. 280).  Plaintiff reported from that

from February 2009 to October 2009 she was incarcerated.  (Tr. 357).  Plaintiff

indicated that she was on probation until approximately February 2011 and was

responsible for paying fines and fulfilling community service obligations.  (Tr. 73,

513).

Plaintiff stated that she had been fired from multiple jobs due to her mental

illness.  (Tr. 276).  Earnings reports demonstrate that Plaintiff has worked several

jobs with the following annual earnings: 1) 1994: none; 2) 1995: none; 3) 1996:

met earning threshold for four quarters of coverage with one employer,[2] totaling

$6208.44; 4) 1997: met earning threshold for four quarters of coverage with four

---

[2] After 1977, the Commissioner of the Social Security Administration determines the amount of taxable earnings that will equal a credit for each year which is determined by using a formula in the Social Security Act that reflects a national percentage increase in average wages.  42 U.S.C.A. § 413; 20 C.F.R. § 404.140; 20 C.F.R. § Pt. 404, Subpt. B, App.; "Quarters of coverage," 1 Soc. Sec. Disab. Claims Prac. & Proc. § 8:10 (2nd ed.) (list of earnings needed to earn one quarter of coverage for years from 1975 to 2012); *see also* "How do you earn Social Security credits?" http://www.ssa.gov/section218training /basic_course_3.htm#10 (last accessed July 10, 2015) (list of required earnings through 2015).

In a claimant's earnings record, a "c" indicates that a claimant has earned enough to qualify for a quarter of coverage and a "n" indicates that the threshold amount was not earned in a given year. *See* "Understanding an earnings record," 1 Soc. Sec. Disab. Claims Prac. & Proc. § 5:21 (2nd ed.).  For example, in 2000, "cccc" would indicate that a claimant has earned at least $780 each quarter of 2000 and "cccn" would indicate that a claimant earned at least $780 for the first three quarters of 2000.  *See* "Understanding an earnings record," 1 Soc. Sec. Disab. Claims Prac. & Proc. § 5:21 (2nd ed.); "How do you earn Social Security credits?" http://www.ssa.gov/section218training/basic_course_3.htm#10 (last accessed July 10, 2015).

employers, totaling $5423.06; 5) 1998: met earning threshold for first three quarters of coverage with two employers, totaling $2425; 6) 1999: none; 7) 2000: did not meet earning threshold for any quarter of coverage with two employers, totaling $456.96; 8) 2001: met earning threshold for four quarters of coverage with nine employers, totaling $3344.18; 9) 2002: met earning threshold for first two quarters of coverage with four employers, totaling $2342.04; 10) 2003: met earning threshold for first quarters of coverage with two employers, totaling $1129.77; 11) 2004: met earning threshold for first quarters of coverage with two employers, totaling $1265.50; 12) 2005: met earning threshold for first quarter of coverage with one employer, totaling $1324.33; 13) 2006: did not meet earning threshold for any quarter of coverage with three employers, totaling $394.43; 14) 2007: met earning threshold for first quarters of coverage with four employers, totaling $1535.98; 15) 2008: five employers, totaling $5499.47; 16) 2009: one employer, totaling $35.09; 17) 2010: one employer, totaling $351.21; and, 18) 2011: none.  (Tr. 218-219, 230-241, 254-259).

There was an unsuccessful attempt to obtain medical files from two different facilities.  A record dated December 21, 2007, shows an unsuccessful attempt to

obtain medical records from Four Winds Hospital ("Four Winds") requesting files from "Admission and Discharge Dates: 03/98," admission history, physical discharge summary, progress notes, and all consultation reports and clinical notes. (Tr. 418). A record dated December 21, 2007, shows an unsuccessful attempt to obtain medical records from SCI/Cambridge Springs Prison for the period of "10/98." (Tr. 419).

## A. Plaintiff's Self-Report and Testimony

In a function report dated December 28, 2007, Plaintiff reported that she lived alone in a trailer, and she did not socialize much or engage in many daily activities aside from taking her medication and watching television. (Tr. 285). At the time of the December 2007 report, Plaintiff stated that she cared for a cat and received help from her son. (Tr. 286). She also claimed that she experienced nightmares and did not sleep well. (Tr. 286). Plaintiff alleged that she had difficulty maintaining her personal care due to "uncontrollable shakes," and her son assisted her with activities such as dressing and caring for her hygiene. (Tr. 286). Plaintiff shopped in stores for brief periods, but she reported experiencing anxiety and paranoia. (Tr. 288). Plaintiff reported that she did not follow

instructions well and did not get along with others.  (Tr. 290-91).  In response to how her impairments impacted her abilities, Plaintiff checked nearly all the boxes to include: lifting, squatting, bending, standing, reaching, walking, kneeling, talking, hearing, stair climbing, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others. (Tr. 290).  Plaintiff detailed "I can only lift so much and my hands give out. As far as squatting, bending, standing, and reaching, my balance is off and extremely shaky, my speech is slower and groggy, I can't remember conversations or what I watched on television, I am unable to focus on one thing and I am unable to concentrate, my understanding is off, I am unable to follow instructions, and I am a loner."  (Tr. 290).

During the administrative hearing on March 24, 2010, Plaintiff reported that her living arrangement and weekly schedule is filled with a significant amount of structure as a requirement for her probation.  (Tr. 71-73, 79).  At the time of the hearing, she: received public assistance; had been living at Harbor Safe House ("Harbor") which she described as a drug and alcohol facility where she also received counseling; and, volunteered at the Goodwill sorting clothes a few hours a

day Monday through Friday.  (Tr. 71-73).  Plaintiff testified that due to abuse, she had been receiving mental health treatment since she was a child and that she received inpatient treatment for three to four weeks when she was sixteen at a facility called "Saint Joes."  (Tr. 78-79).  Plaintiff testified that she was treated at Four Winds Hospital near Carmel, New York.  (Tr. 78).  It appears that Plaintiff received meals while living at Harbor.  *See* (Tr. 80).  Plaintiff testified that at the time of the hearing, her son lived with her mother, and it was not clarified at what time she no longer had custody of her son.  (Tr. 81).

At the administrative hearing on May 31, 2012, Plaintiff testified that she has basic computer skills and is no longer certified as a certified nurse assistant. (Tr. 41).  Plaintiff affirmed that she was hospitalized in 1997 for a six-month period at Four Winds to address psychiatric issues and has since received outpatient care.[3]  (Tr. 42).  She indicated that her medications make her tired, and she does not sleep well at night.  (Tr. 42).  She testified that she lived alone[4] and usually received help from a friend to perform her housework because she gets so

---

[3]  Although Plaintiff's counsel stated 1997 during the hearing, the record shows Plaintiff's treatment with Four Winds commencing in March 1994 and Plaintiff states that her six month treatment was from March 1998 to September 1998. *See infra* (Tr. 78, 268, 278, 375-386).

[4]  Records also indicate that she lived with a boyfriend at the time.  (Tr. 343, 625).

tired.  (Tr. 42-43).  Plaintiff testified that she was able to prepare meals, and take

care of her own personal hygiene, including bathing, taking care of her hair, and

other tasks.  (Tr. 43).  Plaintiff testified that her friend comes over two to three

times per week to bring her groceries and assist her with household chores.  (Tr.

43-44).  Plaintiff stated the last time she had an alcoholic beverage was in 2007,

and she had not used any controlled substances since at least March 2010.  (Tr.

44).  In the prior two years, Plaintiff folded clothes at Goodwill as part of her

community service for a parole violation, and she also worked for approximately a

week at a fast food restaurant.  (Tr. 44-45, 483).

In 2007, Plaintiff worked as a nursing assistant at a convalescent center in

Georgia for approximately a week when she was "on the run from the law."  (Tr.

45-46).  She explained that she quit these jobs due to stress and because she could

not be around people.  (Tr. 45-46).  Plaintiff testified that due to her lack of sleep at

night, she was tired during the day and typically napped for two to three hours.

(Tr. 47).  She stated that she could not focus and had difficulty with her memory.

(Tr. 48).  Plaintiff also testified that her depression caused her to neglect to take

medication, made it difficult for her to get out of bed, and affected her memory,

and motivation.  (Tr. 49).  Plaintiff also testified that since a recent increase in her medication dosage, she did not have hallucinations as much as she used to, however, she still had delusions about people and experienced anxiety when she was in public and crowded places.  (Tr. 49-50).

## B.  Relevant Treatment History and Medical Opinions

### 1.  Four Winds Hospital: David L. Pogge, Ph.D; Evelyn Smick, C.S.W.

When Plaintiff was eighteen, from March 17, 1994, to April 8, 1994,[5] Plaintiff received in-patient treatment from the Four Winds Hospital in Katonah, New York.  (Tr. 375-386).  At the time of treatment, Plaintiff reported a history of early childhood trauma including rape from age six to eight by her biological father, physical abuse and neglect, placement into foster care, rape by a foster father at the age of ten, and was an emancipated foster youth and homeless upon entry to Four Winds for treatment.  (Tr. 382, 384, 385, 472).  Plaintiff underwent a psychological evaluation by Dr. Pogge, who found the test data invalid for assessing a diagnosis at that time, noting that:

> Inspection of the response set indices embedded within these test instruments reveals that this individual has approached these tests in a

---

[5] As discussed below, although Plaintiff asserts that she received inpatient treatment for six months at Four Winds beginning in March 1998, there are no records for this time period.

manner designed to unrealistically dramatize and inordinately exaggerate her emotional distress and symptom severity. This bias towards negative self-presentation is so extreme that it renders these test data invalid for determining the patient's actual diagnosis or true symptomatic status, and makes estimation of risk for self-destructive or other behaviors impossible. This type of test profile is sometimes a reflection of the patient's subjective sense of being extraordinarily overwhelmed, or may be a deliberate effort at self-dramatization as a "cry for help." This type of test profile is also produced by individuals who respond randomly to the questionnaires, either because of impaired reading ability, oppositional refusal to respond honestly, or because they are so ·confused or disorganized that coherent responding in a structured format is impossible. Regardless of its specific cause, these self-report measures cannot be relied upon at this time to provide an accurate picture of this individual's functioning. Moreover, it has been found that patients in this setting who are either unable or unwilling to comply with these questionnaire procedures are rarely able or willing to comply with more time consuming face-to-face administrations sufficiently to allow for valid collection of psychometric data. Given this approach to these tests, the most reliable and valid information regarding this patient's condition is likely to come from direct observations her behavior in the clinical setting.

(Tr. 375-376).   During the course of this in-patient treatment, Plaintiff was diagnosed with depressive disorder, bulimia nervosa, and personality disorder with borderline features.   (Tr. 384-385).   On March 17, 1994, a treatment provider[6]

---

[6] The signature is illegible.

determined that Plaintiff had a Global Assessment of Functioning ("GAF") score

of 30. (Tr. 384). On April 8, 1994, Plaintiff's GAF score was 40.[7] (Tr. 385).

## 2. Ira Gensemer, Ed.D.

Dr. Gensemer reviewed Plaintiff's medical records and completed a

psychiatric review technique form on January 8, 2008. (Tr. 389, 395). He found

that Plaintiff suffered from schizophrenic, paranoid or other psychotic disorders,

and polysubstance abuse. (Tr. 387, 389, 395). Dr. Gensemer opined that Plaintiff

had mild restrictions in her activities of daily living, moderate limitations in

maintaining social functioning, and had moderate limitations in maintaining

---

[7] *See Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014) ("The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed.1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. *Id.* The score is useful in planning treatment and predicting outcomes. *Id.* The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if *either* the symptom severity *or* the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the *worse* of the two. . . . . A GAF score of 31–40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *Id.* A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.*").

concentration, persistence, or pace.  (Tr. 397).  He also found that she suffered one or two repeated episodes of decompensation, each of extended duration.  (Tr. 397).

In a mental Residual Functional Capacity ("RFC") examination on the same date, Dr. Gensemer opined that Plaintiff was markedly limited in her ability to: 1) understand and remember detailed instructions; 2) carry out detailed instructions; and, 3) interact appropriately with the general public.  (Tr. 421).  He assessed moderate limitations in her ability to: 1) understand and remember very short and simple instructions; 2) carry out very short and simple instructions; 3) maintain attention and concentration for extended periods; 4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 5) sustain an ordinary routine without special supervision; 6) work in coordination with or proximity to others without being distracted by them; 7) make simple work-related decisions; 8) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 9) accept instructions and respond appropriately to criticism from supervisors; 10) get along with coworkers or peers without distracting them or exhibiting behavioral

extremes; 11) respond appropriately to changes in the work setting; 12) travel in

unfamiliar places; and, 13) set realistic goals or make plans independently of

others.  (Tr. 421).  Dr. Gensemer concluded that Plaintiff could:

> perform simple, routine, repetitive work in a stable environment. She
> can understand, retain, and follow simple job instructions, i.e.,
> perform one and two step tasks. She has a history of impulsive
> behavior. Moreover, she can make simple decisions. She is able to
> carry out very short and simple instructions. Additionally, she has a
> history of distractive behavior. She experiences social anxiety and
> discomfort around strangers. She is capable of asking simple
> questions and accepting instruction. She can function in production
> oriented jobs requiring little independent decision making. She retains
> the ability to perform repetitive work activities without constant
> supervision. . . .
>    The claimant is able to meet the basic mental demands of
> competitive work on a sustained basis despite the limitations resulting
> from her impairment.

(Tr. 422).  Dr. Gensemer noted that Plaintiff had a good rapport with her evaluator,

showed mild paranoia, and had good to fair insight, good grooming, was able to

write detailed answers regarding activities of daily living, and presented with

normal thought patterns, and normal reasoning.  (Tr. 399).

### 3.  John Doty, M.D.

In a treatment record dated October 15, 2007, Plaintiff reported experiencing

a depressed mood, anhedonia, fatigue, impaired memory, difficulty concentrating,

and suicidal thoughts without plan. (Tr. 400). Dr. Doty noted that Plaintiff's symptom onset was several years ago, and that she had been stable while on medication. (Tr. 400). Upon examination Plaintiff was agitated but alert, exhibited good grooming, full facial expressions, normal speech pattern and content, normal thought patterns, good insight, and normal reasoning. (Tr. 401). Dr. Doty assessed Plaintiff with bipolar disorder and noted her schizoaffective disorder along with manic/hypomanic episodes. (Tr. 413-14).

### 4. Dickinson Mental Health Center

In July 2008, Plaintiff was referred to the Dickinson Mental Health Center. During an examination with Joe Sherry, LSW, Plaintiff reported mood swings and increased feelings of depression. (Tr. 472). Plaintiff reported not liking to be around people and often having racing thoughts before bed which diminished her sleep. (Tr. 472). Plaintiff reported a history of bulimia and anorexia and noted that she was currently eating only once per day. (Tr. 472). Plaintiff reported that while she had been prescribed psychotropic medications, she was not currently taking them due to weight gain. (Tr. 472). Plaintiff reported that she "'does not feel comfortable with herself unless she is drinking,' having taken her first drink at

age 6 and begun drinking on a regular basis at the age of 13." (Tr. 472). Upon examination, Mr. Sherry observed that Plaintiff's speech, while slow, was clear and goal-directed. Mr. Sherry observed that Plaintiff appeared to have a constricted affect for much of the session, in that she appeared mildly suspicious and uneasy, however, she was able to joke during the examination. (Tr. 472). Mr. Sherry observed that Plaintiff was oriented by two, noting that she did not watch the news and, therefore, was unable to state who the president was. (Tr. 472). Mr. Sherry observed that Plaintiff demonstrated difficulty in focusing on spelling the word "WORLD," and concluded that such "may indicate that she has trouble concentrating." (Tr. 472). Mr. Sherry diagnosed Plaintiff with bi-polar disorder most recent depressed features, post-traumatic stress disorder, alcohol dependence, borderline personality disorder, and assessed Plaintiff with a GAF score of 58. (Tr. 474).

### 5. Tioga County Prison Medical and History Form

In a medical history form dated February 18, 2009, it was noted that Plaintiff suffered from depression but had not taken her medication in months. (Tr. 478).

**6.  Tioga County Human Services Agency (Tioga); Jon Grigg, M.D.,**

**Psychiatrist; David August, D.O.; Sandra Brill, CRNP**

On December 20, 2007, Dr. Grigg performed a psychiatric evaluation on

Plaintiff.  (Tr. 408).  Dr. Grigg noted that Plaintiff had "a long history of an

unstable psychotic mood disorder and has carried the diagnosis of Schizoaffective

Disorder since the early 2000's."  (Tr. 407).  Dr. Grigg noted that:

> The history obtained from the patient was considered fairly
> reliable. Her fiancée . . . provided additional information about current
> difficulties. . . . A great deal of information was developed, and there
> are some old records, including a psychiatric evaluation by Dr.
> Venturanza from 2001. The patient, apparently, had been hospitalized
> at Soldiers and Sailors Memorial Hospital prior to that evaluation, but
> her inpatient paperwork was not included in the current chart. She has
> had other psychiatric hospitalizations, as well as a number of mental
> health involvements while in the state correctional systems.
>      . . . there was a great deal of family dysfunction and substance
> abuse, and she was the victim of sexual abuse by her father. She was
> in the foster care system and . . . sexually victimized by a foster father.
> She left school early and was already a heavy user of alcohol by that
> time.

(Tr. 407).  Plaintiff reported "a very clear history of significant mood instability,

irrational thinking, increased paranoia, and auditory hallucinations when she is at

her worst."  (Tr. 407).  At the time of the report, Plaintiff was on low dose of

Seroquel, as well as Celexa which "helped her to sleep a little better." Dr. Grigg noted that "[although] paranoid, she [wa]s not hearing voices." (Tr. 407).

In the December 2007 report, Dr. Grigg noted that Plaintiff was obese and discussed an alternative atypical psychotic to minimize the impact on her weight. (Tr. 408). Dr. Grigg opined that Plaintiff's posttraumatic stress symptoms adversely impacted her sleep through nightmares of abuse and Dr. Grigg prescribed Trazodone to promote sleep and suppress nightmares. (Tr. 408). Dr. Grigg noted that Plaintiff "has some social anxiety, but it is not clear if this is more of paranoia or anxiety disorder." (Tr. 408). Dr. Grigg observed that Plaintiff was alert, cooperative, fairly conversational, somewhat anxious, and subdued. (Tr. 408). She demonstrated good grooming and hygiene. (Tr. 408). Dr. Grigg remarked that there was no evidence of systematized delusions or hallucinations, and that Plaintiff's paranoia was "mild." (Tr. 408). Dr. Grigg diagnosed Plaintiff with schizoaffective disorder-depressed type, alcohol dependence-in early sustained remission, posttraumatic stress disorder and mixed personality traits, and assessed her with a GAF score of 50. (Tr. 408).

In an assessment dated January 11, 2008, Plaintiff reported nausea and vomiting for three to four days and did not take her medications. (Tr. 451). Plaintiff stated that her drug and alcohol counselor suggested that she "wean herself off of her psychiatric medications because they [were] a crutch just like alcohol." (Tr. 451). Plaintiff reported that during the prior week without medication, her paranoia had increased. (Tr. 451). Plaintiff experienced a recent relapse in alcohol. (Tr. 451). Under the supervision of Dr. Grigg, the nurse practitioner Sandra Brill wrote that Plaintiff "struggles with taking the psychiatric medication based on D&A counseling information. . . . We spoke at length about the dual diagnoses and the need to remain on psychiatric medications." (Tr. 451).

In a treatment record dated January 25, 2008, Plaintiff was assessed with a GAF score of 65. (Tr. 447). At that time, she was animated and cheerful, alert, and oriented. (Tr. 447). Plaintiff reported that the current combination of medications worked for her. (Tr. 447). Plaintiff came with her boyfriend and reported that they have had significant episodes of arguing. (Tr. 447).[8] What Plaintiff's boyfriend labeled as paranoia in response to his speaking to a former

---

[8] From the records, this former boyfriend is named Travis. Since around 2009, Plaintiff's boyfriend was Chris who also submitted a statement on her behalf. (Tr. 343, 625).

girlfriend, Plaintiff described as "simple jealousy." (Tr. 447). Plaintiff reported that her current medications were working well, that she was not anxious, that she has avoided drugs and alcohol, and that she has been sleeping well throughout the night. (Tr. 447). Plaintiff stated that her paranoia was under control, but that she continued to struggle with jealousy related to her boyfriend. (Tr. 447).

In a treatment record dated February 19, 2008, Plaintiff was assigned a GAF score of 60. (Tr. 445). Plaintiff appeared anxious with "jittering of her feet and hands." (Tr. 445). Plaintiff reported trouble sleeping and was anxious most of the day. (Tr. 445). Despite taking three tablets of 100 mg Trazodone at bedtime, Plaintiff was unable to fall asleep before 3:00 a.m., and when she was asleep, it was interrupted by dreams of death, resulting in her being tired during the day. (Tr. 445). Plaintiff reported that her mood was variable and the fluctuation was worse in the past two weeks. (Tr. 445). In a discharge summary dated March 11, 2008, Plaintiff was assigned a GAF of 50. (Tr. 443).

In a treatment record dated July 2, 2010, Plaintiff received counseling from Dr. August who assigned a GAF score of 38. (Tr. 510). After starting Lithium, Plaintiff developed severe hives and sought emergency room treatment. (Tr. 510).

Plaintiff reported still having "very severe violent outbursts" and reported that she had hit her boyfriend the day of the report.  (Tr. 510).  She was remorseful, behaved calmly, and was friendly during her examination. (Tr. 510).  Dr. August noted that Plaintiff continued to have problems with paranoia, had been having extreme mood swings, and experienced hallucinations recently.  (Tr. 510).  Dr. August took Plaintiff off Lithium and started her on Clozapine.  (Tr. 510).

In a treatment record dated August 26, 2010, Dr. August assigned Plaintiff a GAF score of 55 and noted a continuing diagnosis of schizoaffective disorder, bipolar type, PTSD, possible personality pathology, and a history of alcohol dependence.  (Tr. 508).  At that time, Plaintiff reported that she was doing much better, and her behavior improved.  (Tr. 508).  Plaintiff reported a decline in depression symptoms and was able to get out of bed and "do something."  (Tr. 508).  Her mood was good, her affect was appropriate, she denied suicidal thoughts and hallucinations, and she was pleasant and cooperative.  (Tr. 508).

In a treatment record dated May 19, 2011, Plaintiff reported that she had not been taking her medicine for the last two weeks and that she has had problems obtaining her medication due to a recent change in laboratories and blood test

results not being forwarded to her pharmacy.[9]   (Tr. 614).   Plaintiff reported that she

"can't help it" that she keeps thinking her boyfriend is cheating on her and accused

him of looking at a woman during a community service event.   (Tr. 614).   Plaintiff

denied any violent outbursts and reported that her mood was more unstable.   (Tr.

614).   Dr. August noted that Plaintiff had "delusions of jealousy."   (Tr. 614).   Dr.

August assessed Plaintiff with a GAF score of 44.   (Tr. 614).

In a treatment record dated September 26, 2011, Plaintiff stated, "'When I

can get my medicine I do great.   It keeps getting stopped because Laurel Health is

not sending in the blood tests when I get them done.'"   (Tr. 613).   During the

evaluation, Dr. August observed that Plaintiff had been on her medication for the

past several days and since maintaining her medication, she has not had any

hallucinations and delusions of jealousy regarding her boyfriend.   (Tr. 613).   She

weighed 204.4 pounds.   (Tr. 613).   Dr. August assessed Plaintiff with a GAF score

---

[9]   Plaintiff was required to take blood tests in order to be treated with the atypical antipsychotic,
Clozapine.     National Institute of Mental Health, "Mental Health Medications"
http://www.nimh.nih.gov/health/topics/mental-health-medications/mental-health-
medications.shtml (last accessed July 13, 2015) ("[C]lozapine can sometimes cause a serious
problem called agranulocytosis, which is a loss of the white blood cells that help a person fight
infection. Therefore, people who take clozapine must get their white blood cell counts checked
every week or two. This problem and the cost of blood tests make treatment with clozapine
difficult for many people.").

of 60, counseled her to change her diet, and noted that staff was working towards a solution regarding the "bureaucratic problems" of sending the blood test results in order to obtain Clozapine in a timely matter. (Tr. 613).

In a treatment record dated October 1, 2011, Plaintiff reported that "there have been times where she has stretched the medications to last longer." (Tr. 612). Plaintiff explained that "she does well when she takes the medications regularly, but she sometimes misses or only takes one some nights." (Tr. 612). It is noted that Plaintiff had "some paranoid ideation, getting jealous when her boyfriend is at work and [she] will get partially aggressive at times when she confronts him." (Tr. 612). Plaintiff was assigned a GAF score of 55. (Tr. 612).

In a treatment record dated December 27, 2011, Plaintiff reported that she does poorly when she doesn't take her medicine. (Tr. 610). Plaintiff stated that when she missed some doses two weeks prior, she got paranoid, and she attacked and cut her boyfriend under the eye. (Tr. 610). Plaintiff reported that she avoids seeing people and mostly remains at home. (Tr. 610). Plaintiff reported that she had a poor work history, has had similar problems at work as she does with her boyfriend, and tends to get paranoid at work and run out of the building. (Tr. 610).

Dr. August observed that Plaintiff continued to have a certain level of paranoid thinking. (Tr. 610). Dr. August assessed Plaintiff with a GAF score of 49. (Tr. 610). Dr. August also explained to Plaintiff that the clinic would be closing soon and would be able to see her only one last time. (Tr. 610).

In a treatment record dated January 10, 2012, Plaintiff reported that she attacked her boyfriend over the weekend. (Tr. 609). Dr. August observed that Plaintiff had bruises on her right hand from having punched her boyfriend. (Tr. 609). Plaintiff reported experiencing severe paranoid thinking, and that she continued to avoid people and rarely left her home. (Tr. 609). Dr. August assessed Plaintiff with a GAF score of 42. (Tr. 609).

On January 18, 2012, Dr. August filled out a mental questionnaire in which he opined that Plaintiff had marked limitations in her ability to: 1) maintain attention and concentration for extended periods of time; 2) perform activities within a schedule, maintain regular attendance, and/or be punctual within customary tolerances; 3) sustain ordinary routine without special supervision; and, respond appropriately work changes in the work setting. (Tr. 573-74). Dr. August also opined that Plaintiff had extreme restrictions in 1) completing a normal work

day and work week without interruptions from psychological based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 2) interacting appropriately with the general public; 3) accepting instructions and responding appropriately to criticism from supervisors; (4) getting along with co-workers or peers without distracting them or exhibiting behavioral extremes; and, 5) responding appropriately to ordinary stressors in the work setting. (Tr. 573-74).

The bases for these conclusions were Plaintiff's schizoaffective disorder, bipolar type; post-traumatic stress disorder; and, her history of violently attacking her boyfriend, as evidenced by bruising on her fists. (Tr. 574).

### 7. Harbor Counseling: Tracy Raymin, Licensed Clinical Social Worker (LCSW)

On June 18, 2010, Ms. Raymin completed a mental health questionnaire in which she opined that Plaintiff had marked restrictions in her ability to: 1) maintain attention and concentration for extended periods; 2) sustain an ordinary routine without special supervision; 3) complete a normal workday/workweek without psychological interruptions; and, 4) perform at a consistent pace. (Tr. 505). Ms.

Raymin also opined that Plaintiff had marked restrictions in her ability to accept instructions and respond appropriately to criticism from supervisors, and that she would be absent from work fewer than three times per month due to her symptoms. (Tr. 506).   As support for her conclusions Ms. Raymin simply wrote, post-traumatic stress disorder.   (Tr. 506).   No treatment notes accompanied the checkmark questionnaire.  (Tr. 506).

### 8.  Consultative Examination: Sara Long, Ph.D.

On September 30, 2010, Dr. Long evaluated Plaintiff.  (Tr. 512).  During the September 2010 evaluation, Plaintiff reported that her mother had custody of her son and that she last drank alcohol in 2009.  (Tr. 512).  Dr. Long observed that Plaintiff appeared neat and well-groomed, her eye contact was appropriate, her speech was fluent, clear, and expressive, and her thoughts were coherent and goal directed.  (Tr. 513).  Plaintiff reported that her medication helped her with paranoid feelings, but that she still experienced nightmares.  (Tr. 513).

According to Dr. Long, Plaintiff displayed a full range of appropriate affect in speech and thought content, and demonstrated some depression.   (Tr. 513). Plaintiff was well oriented and satisfactorily performed in tests on her attention,

concentration, and recent and remote memory skills.  (Tr. 513-14).  Dr. Long

observed that Plaintiff appeared to be of average intellect, and her insight and

judgment were fair to poor.  (Tr. 514).  Dr. Long found that Plaintiff suffered some

distraction from depression, and lacked both stress management and appropriate

confrontational skills, noting that Plaintiff reported that in difficult confrontations

she gets "hot," walks off, or "'flip[s] out.'"  (Tr. 514-515).  Dr. Long stated that

Plaintiff may also have some distraction due to change of lifestyle with the

cessation of substance use.  (Tr. 514).  Dr. Long concluded that her evaluation was

consistent with psychiatric and substance abuse problems, which may interfere

with Plaintiff's ability to function on a regular basis.  (Tr. 514).   Dr. Long

recommended for Plaintiff to continue with Harbor's MICA (mentally ill chemical

abuse) program, including individual psychotherapy, and noted that Plaintiff would

benefit from improving skills in communication and utilizing appropriate

assertiveness.  (Tr. 515).  Dr. Long found that Plaintiff's prognosis was "good

given substance relapse prevention and appropriate psychotherapy."  (Tr. 515).

///

///

### 9.  Richard Nobel, Ph.D.

On November 1, 2010, psychologist Dr. Nobel reviewed Plaintiff's medical records and performed a psychiatric review technique, concluding that Plaintiff had schizoaffective disorder, bipolar type, and alcohol dependence, in recent remission. (Tr. 520, 525).  Dr. Nobel opined that these conditions resulted in mild restrictions in her activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace.  (Tr. 527).  Dr. Nobel indicated that there was insufficient evidence to determine whether Plaintiff had experienced any episodes of extended decompensation.  (Tr. 527).

Dr. Nobel further opined that Plaintiff was not significantly limited in her understanding and memory; she had moderate limitations in ability to: 1) maintain attention and concentration for extended periods; 2) perform activities within a regular schedule, maintain regular attendance and be punctual within ordinary tolerances; 3) work in coordination with or proximity to others without being distracted by them; 4) complete a normal workday and workweek without psychologically based interruptions and to perform at a consistent pace without any

unreasonable number and length of rest periods; 5) accept instructions and respond appropriately to criticism from supervisors; 6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; 7) respond appropriately to changes in the work setting; and, 8) set realistic goals or make plans independently of others.  (Tr. 531-32).

Dr. Nobel noted that records from Tioga County Mental Health indicated that she stopped treatment due to a lack of insurance and returned June 2010.  (Tr. 533).  Dr. Nobel concluded that Plaintiff appeared "capable of performing work related skills not around a lot of people."  (Tr. 533).

### 10. Third-Party Lay Statements

In a statement dated June 1, 2010, Plaintiff's mother, Linda Powers, submitted a statement describing the variability of Plaintiff's moods and erratic behavior over the years.  (Tr. 275, 340).  Ms. Powell described that Plaintiff would get fired from her jobs due to insubordination, would go to her car during her work breaks or simply leave without telling anyone because she was upset or crying.  (Tr. 340).  Ms. Powers wrote that "[s]ometimes we would be sitting and talking and she would jump up and start yelling at me. Then leave without an

explanation." (Tr. 340). Ms. Powers wrote that Plaintiff would stay in her room for hours, up to two days without speaking to anyone. (Tr. 340).

In a statement dated June 7, 2010, Chris Stiles[10] indicated that he had been living with Plaintiff for over six months and observed that Plaintiff "snapped out" at different times and different occasions. (Tr. 343). Mr. Stiles wrote that Plaintiff would remain in her room for days. (Tr. 343).

### III.   Legal Standards and Review of ALJ Decision

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). A claimant for disability benefits must show that he or she has a physical or mental impairment of such a severity that:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate

---

[10] A record dated March 27, 2012, states that she has had a boyfriend named "Chris" for two and a half years. (Tr. 625).

area in which he lives, or whether a specific job vacancy exists for
him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a
person is eligible for disability benefits. 20 C.F.R. § 404.1520; *accord Plummer*,
186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not
disabled at any point in the sequence, review does not proceed. 20 C.F.R. §
404.1520(a)(4). The Commissioner must sequentially determine: (1) whether the
claimant is engaged in substantial gainful activity; (2) whether the claimant has a
severe impairment; (3) whether the claimant's impairment meets or equals a listed
impairment; (4) whether the claimant's impairment prevents the claimant from
doing past relevant work; and, (5) whether the claimant's impairment prevents the
claimant from doing any other work. 20 C.F.R. §§ 404.1520, 416.920. Before
moving on to step four in this process, the ALJ must also determine Plaintiff's
residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The
claimant bears the burden of proof at steps one through four. *See Mason v.
Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). If the claimant satisfies this burden,

then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Id.* The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

When reviewing the Commissioner's decision denying a claim for disability benefits, the Court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 564 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence requires only 'more than a mere scintilla' of evidence, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)), and may be

less than a preponderance.  *Jones*, 364 F.3d at 503.  If a reasonable mind might accept the relevant evidence as adequate to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence.  *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Johnson*, 529 F.3d at 200.

### A. Plaintiff's Credibility

Plaintiff asserts that the ALJ erred in finding Plaintiff lacked credibility.  Pl. Brief at 11-12, (Tr. 20).

Where a medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a credibility finding on the claimant's subjective statements. SSR 96-7p.  The credibility finding must be based on a consideration of the entire case record.  SSR 96-7p.  In determining a claimant's credibility regarding the severity of symptoms, the ALJ must consider the following factors in totality: 1) the extent of daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) precipitating and aggravating factors; 4) the type,

dosage, effectiveness, and side effects of any medication; 5) treatment other than medication for the symptoms; 6) measures used to relieve pain or other symptoms; and, 7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  SSR 96-7p; 20 C.F.R. §§ 404.1529, 416.929; *accord Canales v. Barnhart*, 308 F. Supp. 2d 523, 527 (E.D. Pa. 2004).

Evidence can be used to discount credibility if such evidence demonstrates a contradiction or inconsistency.  *See e.g. Horodenski v. Comm'r of Soc. Sec.*, 215 F. App'x 183, 188 (3d Cir. 2007) (finding significant a plaintiff's testimony about her daily activities was internally inconsistent, thus supporting the ALJ's determination of according her testimony little weight); *Smith v. Astrue*, 359 F. App'x 313, 317 (3d Cir. 2009) (claimant's testimony that she was essentially bedridden contradicted by evidence that she had been primary caretaker for small child for two years); *see also Orn v. Astrue*, 495 F.3d 625, 636 (stating that inconsistencies in testimony or between testimony and other evidence is proper reason to discredit a social security plaintiff); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (ALJ erred in disregarding uncontradicted evidence that a plaintiff's thirteen-year-old son took responsibility for many of plaintiff's activities

of daily living); *Hernandez v. Astrue*, No. CV 09-1626 SS, 2010 WL 1710350, at *4 (C.D. Cal. Apr. 26, 2010) (finding error where the ALJ discredited a plaintiff based on disbelief of the plaintiff's assertion that he spoke very little English although he lived in the United States for at least 36 years when the "record was replete with evidence indicating that Plaintiff spoke very little English and was in need of an interpreter.").

### 1. Evidence of Twelve-Year-Old Son's Assistance in Activities of Daily Living

The ALJ erred in concluding that Plaintiff's uncontradicted statement in the functional report that her twelve-year-old son helped her with activities of daily living was not credible. Specifically, the ALJ found:

> The claimant's son does not live with her. He was 15 as of September 2010, and was therefore only 12 when the claimant completed her functional report and was only three years old as of the claimant's alleged onset date. The claimant's allegations regarding her reliance on her young son to do her housework, feed her, and care for her personal needs are not credible.

(Tr. 20) (internal citation omitted). The ALJ also implied that given that Plaintiff's son was three-years-old at the time of alleged disability onset, merely having

custody of a young child during a period of alleged disability is a ground to discredit Plaintiff.  *See* (Tr. 20).

In this instance, a twelve-year-old child caring for a parent is not beyond the realm of possibility such that an ALJ may simply disbelieve Plaintiff without contradictory evidence.[11]   Evidence can be used to discount credibility if such evidence demonstrates a contradiction or inconsistency.  *See e.g. Horodenski v. Comm'r of Soc. Sec.*, 215 F. App'x 183, 188 (3d Cir. 2007); *Smith v. Astrue*, 359 F. App'x 313, 317 (3d Cir. 2009); *see also Orn v. Astrue*, 495 F.3d 625, 636; *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *Hernandez v. Astrue*, No. CV 09-1626 SS, 2010 WL 1710350, at *4 (C.D. Cal. Apr. 26, 2010).  With facts similar to this case, in *Bauer v. Astrue*, the Seventh Circuit observed:

> [The plaintiff] is heavily medicated, and this enables her to cope with the challenges of daily living, and would doubtless enable her to work on some days. *But the administrative law judge disregarded uncontradicted evidence that the plaintiff's [13-year-old] son cooks*

---

[11] A review of child labor law history and the child labor exemptions to the Fair Labor Standards Act demonstrates that it is not outside the realm of possibility for a twelve-year-old child to take on household responsibilities.  *See e.g.*, 29 U.S.C.A. § 213(C)(1) (permitting agricultural labor for children twelve years old and younger); *see also* National Alliance for Caregiving & United Hospital Fund, *Young Caregivers in the U.S.* (2005) available at http://www.caregiving.org/data/youngcaregivers.pdf (last visited June 1, 2015) (explaining the prevalence of caregivers between the ages of eight and eighteen and the scope of their care for disabled adult family members).

> *most meals, washes the dishes, does the laundry, and helps with the grocery shopping.*

*Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (emphasis added).   As to the ALJ's implication that Plaintiff's custody of a young child automatically contradicts an assertion of disability, such is error.   *See Gonzales v. Colvin*, No. 3:13-CV-02620, at ECF No. 26 (M.D.Pa. Feb. 17, 2015) (Adopting recommendation ECF No. 24) ("The ability to care for children, alone, does not inherently indicate that a claimant possesses the ability to perform on a regular and continuing basis in a work-setting.").   Additionally, while drawing a negative inference from Plaintiff having custody of her son, the ALJ did not discuss the probative significance and reasons underlying Plaintiff's subsequent loss of custody.   This is error.   Based on the foregoing, the Court finds that the ALJ erred in discrediting uncontradicted evidence of Plaintiff's twelve-year-old son assisting her.

## 2.  March 1994 Medical Record

The ALJ erred in discrediting Plaintiff based on an excerpt taken out of context from a treatment record dated March 28, 1994.  The ALJ found:

> In terms of the claimant's alleged mental impairments, the medical record does not support her allegations. [Dr. Pogge] who evaluated the claimant in 1994 noted that the claimant "unrealistically dramatized and inordinately exaggerated" her symptoms. [Dr. Pogge's] observation suggests that the claimant has a tendency to exaggerate her symptoms, which undermines her credibility.

(Tr. 20) (internal citation omitted).  In the 1994 medical record Dr. Pogge stated:

> Inspection of the response set indices embedded within these test instruments reveals that this individual has approached these tests in a manner designed to unrealistically dramatize and inordinately exaggerate her emotional distress and symptom severity. This bias towards negative self-presentation is so extreme that it renders these test data invalid . . . . This type of test profile is sometimes a reflection of the patient's subjective sense of being extraordinarily overwhelmed, or may be a deliberate effort at self-dramatization as a "cry for help." This type of test profile is also produced by individuals who respond randomly to the questionnaires, either because of impaired reading ability, oppositional refusal to respond honestly, or because they are so ·confused or disorganized that coherent responding in a structured format is impossible.

(Tr. 375-376).  Assessment of functional limitations requires the ALJ to consider multiple issues and all relevant evidence to obtain a longitudinal picture of a plaintiff's overall degree of functional limitation.  20 C.F.R. § 404.1520a(c)(1). Although the ALJ acknowledged Plaintiff's treatment record from March 1994, the ALJ omitted relevant evidence that contributes to an accurate longitudinal picture of Plaintiff's functional limitation such as: that the March 1994 treatment record

was from the beginning of period in-patient treatment; that the doctor from this treatment record noted that Plaintiff had a history of early childhood trauma including rape from age six to eight by her biological father, physical abuse and neglect, placement into foster care and rape her by foster father at the age of ten; and, Plaintiff was an emancipated foster youth and homeless upon entry to the treatment facility that generated the cited record.  (Tr. 382, 384, 385, 472).

The ALJ did not accurately address the nuance evident Dr. Pogge's statement in its entirety.  *Compare* (Tr. 20) *with* (Tr. 375).   When Plaintiff underwent a psychological evaluation, Dr. Pogge found the test data invalid for assessing a diagnosis at that time, and stated that "[t]his type of test profile is *sometimes a reflection of the patient's subjective sense of being extraordinarily overwhelmed*, or may be a deliberate effort at self-dramatization *as a 'cry for help*.'"  (Tr. 375) (emphasis added).  The ALJ selectively quoted from Dr. Pogge in a manner that presented only the evidence that supported the ALJ's conclusion when there were other relevant and probative statements from Dr. Pogge's assessment.  This selective quoting amounted to error as the ALJ was required to provide some explanation for a rejection of probative evidence which would

suggest a contrary disposition.  *See Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir.

1994); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).   The ALJ did not

evaluate the quoted language in the context of the full record which reveals that at

the time of Dr. Pogge's statement, Plaintiff had recently turned eighteen, was an

emancipated foster youth[12] and subsequently became homeless.   These stressors

---

[12] The Court notes that a significant percentage of the nearly 20,000 foster youth emancipated nationwide annually in the 1980s and 1990s faced many educational, financial, health, and mental health challenges.  *See e.g.*, U.S. Department of Health and Human Services, *Tittle IV-E Independent Living Programs: A Decade in Review*, at pp. 1-1 to 1-3 (U.S. Government Printing Office, 1999) (available through https://www.childwelfare.gov (last visited June 1, 2015)). Many foster youth across the nation were automatically emancipated from the foster care system upon reaching the statutory age of majority regardless of whether they were still in the process of completing high school, thus resulting in as high as 66 percent of eighteen-year-olds not completing high school.   *Id.*   Other statistics for emancipated foster youth include 38% experienced emotional disturbances, 17% had drug abuse problems, 9% suffered health problems, 32% were receiving some form of public assistance, 44% reported having problems acquiring needed medical care, and 37% reported either being seriously physically victimized, sexually assaulted, raped, incarcerated, or homeless at least once since discharge.  *Id.*  Within twelve to eighteen months after emancipation, 81% had at least one job after leaving care, yet were not successful in maintaining employment and those that were employed, on average, earning less than the equivalent of full-time minimum wage.  *Id.* See also U.S. Department of Health and Human Services, *Foster Care: Effectiveness of Independent Living Services Unknown* (GAO/HEHS- 00-13) (U.S. General Accounting Office, November 1999) http://www. gao.gov/products/HEHS-00-13 (last visited June 1, 2015); 143 Cong. Rec. H2012-06, 143 Cong. Rec. H2012-06, 1997 WL 210472 (statement of Rep. Burton); Dennis E. Cichon, J.D., L.L.M, *Encouraging A Culture of Caring for Children with Disabilities: A Cooperative Approach*, 25 J. Legal Med. 39, 56 & n.141-143 (2004); Jessica Jean Kastner, *Beyond the Bench: Solutions to Reduce the Disproportionate Number of Minority Youth in the Family and Criminal Court Systems*, 15 J.L. & Pol'y 941, 954 (2007); Jennifer Pokempner & Lourdes M. Rosado, *Dependent Youth Aging out of Foster Care in Pennsylvania: A Judicial Guide*, Juvenile Law Center (2003) http://www. jlc.org/sites/default/files/ publication_pdfs/ dependent-youth-aging-out.pdf (last visited June 1, 2015); The Court also notes that Plaintiff would have emancipated

could reasonably support Dr. Pogge's other statement that Plaintiff's responses demonstrated Plaintiff's "subjective sense of being extraordinarily overwhelmed" or was a "cry for help." *See* (Tr. 375-76).  The ALJ also did not acknowledge that at the time of the quoted language Plaintiff was hospitalized and diagnosed with depressive disorder, bulimia nervosa, and personality disorder with borderline features.  (Tr. 384-385).  Moreover, the ALJ did not acknowledge the quoted language in the context that on March 17, 1994, a treatment provider in the facility determined that Plaintiff had a Global Assessment of Functioning ("GAF") score of 30 (Tr. 384) and on April 8, 1994, Plaintiff's GAF score was 40.  (Tr. 385).

The ALJ must explicitly weigh all relevant, probative, and available evidence; and, provide some explanation for a rejection of probative evidence which would suggest a contrary disposition. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994).  The ALJ may properly accept some parts of the medical evidence and reject other parts, but must consider all the evidence and give some reason for discounting the rejected evidence. *Id.*  Based on the foregoing, the Court concludes that the ALJ erred in drawing an adverse inference for the March 1994

---

from the foster care system before the added protections provided by the federal Foster Care Independence Act of 1999.

treatment record without addressing evidence that could lead to a contradictory conclusion.

### 3. Work History

The Court finds that the ALJ erred in drawing an adverse inference from Plaintiff's "poor" work history.  In the July 2012 decision, the ALJ found:

> The claimant has a very poor work history.  The fact that the claimant has never engaged in substantial gainful activity, even prior to the date she allegedly became disabled, suggests that the claimant is not attached to the workforce and undermines her credibility regarding her motivation to work.

(Tr. 21) (internal citation omitted).  Under ruling 96-7p, a credibility determination of an individual's statements about pain or other symptoms and about the effect the symptoms can be based on "[s]tatements and reports from the individual and from treating or examining physicians or psychologists and other persons about . . . prior work record and efforts to work . . . ."  SSR 96-7p; *see also Dobrowolsky v. Califano*, 606 F.2d 403 (3d Cir. 1979) (Work history is a proper consideration in the credibility assessment).  Under 20 C.F.R. §§ 404.1571, 416.971, "a claimant's ability to work on a part-time basis may constitute probative evidence of his or her ability to perform the duties of a full-time job." *Henderson v. Astrue*, No. CIV.A.

10-1638, 2011 WL 6056896, at *6 (W.D. Pa. Dec. 6, 2011); 20 C.F.R. §§ 404.1571, 416.971 ( "[e]ven if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."); *see also Lyons v. Heckler*, 638 F. Supp. 706, 711 (E.D. Pa. 1986) ("If a claimant performs work during any period in which she alleges that she was disabled, the work performed may demonstrate that she is able to engage in substantial gainful activity").

The inferences drawn from a claimant's work history vary depending on the facts. *See e.g.*, *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979) (holding that a claimant's testimony "is entitled to substantial credibility" where the claimant has a lifetime record of continuous work); *Ford v. Barnhart*, 57 F. App'x 984, 988 (3d Cir. 2003) (finding no error where an ALJ made an adverse credibility determination based on erratic pre-onset work history); *Crotsley v. Astrue*, No. CIV.A. 3:10-88, 2011 WL 5026341, at *4 (W.D. Pa. Oct. 21, 2011) (an inference of a lack of motivation to work can be drawn from a sporadic work history prior to disability onset); *Collins v. Astrue*, No. CIV.A. 11-1275, 2012 WL 2930885, at *11 (W.D. Pa. July 18, 2012) (an inference of a lack of motivation to

work can be drawn from a sporadic work history prior to disability onset); *Henderson v. Astrue*, No. CIV.A. 10-1638, 2011 WL 6056896, at *6 (W.D. Pa. Dec. 6, 2011) (post onset part-time work could support a finding of non-disability); *Leidler v. Sullivan*, 885 F.2d 291, 294 (5th Cir. 1989) (sporadic work-history as evidence of mental impairment); *Smith v. Heckler*, 735 F.2d 312, 318 (8th Cir. 1984) (finding error where ALJ determined that a claimant lacked motivation, however, the ALJ failed to address claimant's history of work attempts and testimony which supported that claimant simply lacked basic mental ability to follow directions without constant supervision).

Although a sporadic work history may lend to an inference of a lack of motivation to work, a sporadic work history within the mental health context could also allow for the opposite conclusion. *See Leidler v. Sullivan*, 885 F.2d 291, 294 (5th Cir. 1989); *Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986); *Smith v. Heckler*, 735 F.2d 312, 318 (8th Cir. 1984); *Tennant v. Schweiker*, 682 F.2d 707, 709 (8th Cir. 1982) (holding that the plaintiff's personality disorder rendered him unable to engage in substantial gainful employment and required a finding of disability where the plaintiff held 46 jobs in twelve years, his longest tenure was

six months, and he was fired from most of these jobs).  Thus it is crucial for an

ALJ to explicitly weigh all relevant, probative, and available evidence; and provide

some explanation for a rejection of probative evidence which would suggest a

contrary disposition.  *See Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994); *Smith*

*v. Califano*, 637 F.2d 968, 971-72; *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir.

2008) (addressing the context of mental health disability and drawing inferences

from report of activities).  In *Leidler v. Sullivan* the Fifth Circuit observed that:

> [i]n cases of severe mental illness a claimant's sporadic work history
> does not conflict with a finding of the onset of disability during a
> particular twelve-month period, and that [the claimant] is disabled if
> [the claimant] can perform work but not enjoy sustained employment
> because of his [or her] condition.

*Leidler v. Sullivan*, 885 F.2d 291, 294 (5th Cir. 1989) (citing to *Singletary v.*

*Bowen*, 798 F.2d 818, 823 (5th Cir. 1986)).

The Court finds that in addition to the above noted omissions regarding the

longitudinal picture of a plaintiff's overall degree of functional limitation, the ALJ

failed to consider other explanations for Plaintiff's sporadic work history, such as

Plaintiff's testimony that she had been fired or quit from multiple jobs due to her

mental illness.  (Tr. 45-46, 276).

Moreover, the ALJ fails to distinguish Plaintiff's pre-onset disability work history with post-onset work history.   The Court notes that there are missing records and contradictions regarding the date of onset.   Upon review of the record, an onset date of March 1994 is more consistent with Plaintiff's assertion that onset coincided with her in-patient treatment at Four Winds Hospital.   Meanwhile, the stated onset date of March 1998 is not confirmed given the absence of records from Four Winds and incarceration records from that year.   In fact, the quarterly earnings contradict a finding that Plaintiff was hospitalized from March to September 1998 and incarcerated from September to October 2000.  (Tr. 217-222)

From the record, it is evident that Plaintiff repeatedly affirmed that her disability onset was when she began a six month in-patient treatment at Four Winds in March and repeatedly provides March 1998 at the onset date, yet there does not exist any record from Four Winds for 1998.  *E.g.*, (Tr. 42, 78, 268).  In an initial claim form dated November 1, 2007, Plaintiff reported that she went to the hospital in approximately March 1998 for a six month admission and then directly

went to a correctional facility until October 2000.[13]   (Tr. 268).   Records from the

two key institutions to confirm dates of treatment at Four Winds followed by

subsequent incarceration at SCI/Cambridge Springs Prison are not included in the

record.   A record dated December 21, 2007, shows an unsuccessful attempt to

obtain medical records from Four Winds stating "Admission and Discharge Dates:

03/98" and requested admission history and physical discharge summary, progress

notes and all consultation reports and clinical notes.   (Tr. 418).   A record dated

December 21, 2007, shows an unsuccessful attempt to obtain medical records from

SCI/Cambridge Springs Prison for the period of "10/98." (Tr. 419).

Plaintiff repeatedly asserts that her six-month inpatient treatment was at

Four Winds.   (Tr. 42, 78, 278).   There is only one set of records from Four Winds

and those records are only for March 1994, and the ALJ does not indicate if the

records from March 1994 to September 1994 were lost, or otherwise explain the

absence of medical records consistent with Plaintiff's assertion that she was treated

at Four Winds for six months.   (Tr. 375-386).   The record suggests different years

regarding onset, Four Winds' six month treatment, and subsequent incarceration at

---

[13] Plaintiff also indicated that she obtained her GED in 1994, got nursing aid certification in 1996, worked as a nursing aid until October 1998, and from October 1998 to October 2000 she went to Cambridge Prison.  (Tr. 277, 280-281, 359).

Cambridge Springs Prison. *E.g.*, Tr. 15 (ALJ decision stating onset of March 1998); Tr. 42 (During the May 2012 hearing, the ALJ refers to six month treatment at Four Winds occurring in 1997 and Plaintiff affirms); Tr. 78 (in March 2010 hearing, Plaintiff stated she was treated for six months at Four Winds, however had difficulty recalling the dates); Tr. 217 (Plaintiff writing her birthdate as the date of onset); Tr. 230 (Earnings Report lists March 1998 as onset); Tr. 268 (Plaintiff reported March 1998 onset upon admission for a six month inpatient treatment); Tr. 271 (providing explanation of potential onset date); Tr. 278 (Plaintiff indicating treatment at Four Winds from March 1998 to September 1998); Tr. 375-386 (treatment records from Four Winds from March 1994).

The objective data of Plaintiff's income supports finding a 1994 onset date. Given that Plaintiff reports an onset upon entering a six month inpatient program in March at Four Winds immediately followed by two years of incarceration ending in October, there would be one entire calendar year that Plaintiff could not have worked. From 1994 to when she filed her initial claim in 2007, earning reports show that she had zero earnings in 1994, 1995, and 1999. *Supra* Section II (summarizing eighteen years of employment earnings); (Tr. 217-222). The

absence of earnings from 1994 and 1995 are consistent with Plaintiff not working from January 1994 to March 1994, hospitalized from March 1994 to September 1994, and incarcerated from September 1994 to October 1995, given that records show that she worked all four quarters in 1996 and thus contradict a finding that she was incarcerated from January 1996 to October 1996. (Tr. 218). Additionally, given that Plaintiff met the threshold quarterly earning amount for the first three quarters of 1998 (Tr. 218), such earnings is inconsistent with a finding that Plaintiff received inpatient treatment from March 1998 to September 1998 and was incarcerated from September 1998 to October 2000. (Tr. 217-222). Given the inconsistencies and lack of clarity regarding the onset date, it would be difficult to discern the probative value of Plaintiff's pre-onset work history.

The ALJ also does not address the earnings reports which show that Plaintiff has worked several jobs of limited duration with annual earnings ranging from $35.09 to $6208.44 and as many as nine different employers in a year. (Tr. 230-241, 254-259); supra section II (summarizing eighteen years of employment attempts).

Given the contradictions regarding the onset date and ALJ's failure to address relevant evidence, the Court finds that such amounts to error.   Upon remand, further development is required to obtain all available evidence relevant to clarifying the onset date, including from Four Seasons Hospital and the records from the Pennsylvania Department of Corrections to confirm periods of in-patient treatment and incarceration.

### B.  Failure to Weigh all Evidence in Support of Plaintiff's Claim

Plaintiff argues that the ALJ selectively overemphasized the aspects of Plaintiff's medical records that support a finding of non-disability but failed to appropriately account for the variable nature of mental health symptoms and aspects of the record that would support a contrary conclusion.  Pl. Brief at 11.

"Although we do not expect the ALJ to make reference to every relevant treatment note . . .  we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law." *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001).  The ALJ may properly accept some parts of the medical evidence and reject other parts, but must consider all the evidence and give some reason for

discounting the rejected evidence. *See Adorno v. Shalala*, 40 F.3d 43, 48; *see also Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001); *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 435 (3d Cir. 1999) ("[w]here competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence....") (citation omitted); *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014) (reiterating standard forbidding the "cherry-picking" of the medical record).   An ALJ cannot rely only on the evidence that supports his or her conclusion, but also must explicitly weigh all relevant, probative, and available evidence; and provide some explanation for a rejection of probative evidence which would suggest a contrary disposition.   *See Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

A residual functional capacity assessment must be based on consideration of all the evidence in the record, including the testimony of the claimant regarding his or her activities of daily living, medical records, lay evidence, and evidence of pain.   *See Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121-22 (3d Cir. 2000).   Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities

of the claimant.  *See Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986) ("No physician suggested that the activity [the claimant] could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. § 404.1545(a).  "Federal courts have repeatedly held that an ALJ cannot speculate as to a Plaintiff's RFC; medical evidence speaking to a claimant's functional capabilities that supports the ALJ's conclusion must be invoked." *Biller v. Acting Comm'r of Soc. Sec.*, 962 F.Supp.2d 761, 779 (W.D. Pa. 2013) (citations omitted); *see also Gormont v. Astrue*, 2013 WL 791455, at *8 (M.D. Pa. 2013).

The ALJ rejected Plaintiff's psychological impairments because, at various times, she was noted to appear cheerful, animated, well groomed, friendly, and calm.  (Tr. 20-21).  The Court finds that the ALJ's overemphasis on external indicia of proper hygiene and cheerful demeanor, observations which do not contradict medical opinions of Plaintiff's severe mental impairments, while undervaluing the import of Plaintiff's violent outbursts, delusion, and paranoia, amounts to error.  *See Smith v. Califano*, 637 F.2d 968, 971-72 (3d Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and

social activity . . . . It is well established that sporadic or transitory activity does not disprove disability"); *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006) (finding error where the ALJ concluded that medical witnesses had contradicted themselves when they said the plaintiff's mental illness was severe yet observed that she was behaving normally during her office visits. Concluding, "[t]here was no contradiction; bipolar disorder is episodic"). In *Morales v. Apfel*, the Third Circuit found that a doctor's observations that a patient is "stable and well controlled with medication" during treatment did not support the medical conclusion that the patient could return to work. *See Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000). Furthermore, a lay interpretation of a Plaintiff's demeanor during an examination free from the stresses of a work environment will not contradict medical opinions reflecting Plaintiff's serious impairments. *See Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000).

The Court is persuaded by *Bauer v. Astrue*, where the Seventh Circuit observed:

> Many of the reasons offered by the administrative law judge for discounting the evidence of [the plaintiff's treating doctors] suggest a lack of acquaintance with bipolar disorder. For example, the judge noted that the plaintiff dresses appropriately, shops for food, prepares

> meals and performs other household chores, is an "active participator
> [*sic*] in group therapy," is "independent in her personal hygiene," and
> takes care of her 13-year-old son. This is just to say that the plaintiff is
> not a raving maniac who needs to be locked up. She is heavily
> medicated, and this enables her to cope with the challenges of daily
> living, and would doubtless enable her to work on some days.

*Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (emphasis added).  A focus on

indicia of Plaintiff's momentary increased functioning to the exclusion of evidence

demonstrating impaired functioning goes against the requirement for the ALJ to

evaluate all relevant evidence.  *See* 20 C.F.R. § 404.1520a(c)(1); *see also* 20

C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.00 Mental Disorders (B)

(recognizing that for mental impairment "[t]he symptoms and signs may be

intermittent or continuous depending on the nature of the disorder.").

The ALJ overlooked many medical records noting poor mental status

findings.  *See e.g.*, Tr. 400 (depressed mood, anhedonia, fatigue, impaired memory,

difficulty concentrating and suicidal thoughts); Tr. 408 (mild paranoia and recent

auditory hallucinations); Tr. 445 (appearing anxious with "jittering of her feet and

hands); Tr. 609 (bruises on her right hand from having punched her boyfriend).

The ALJ's disregard of evidence that supports Plaintiff's claim amounts to

error.  *See Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *Schaudeck v.*

*Comm'r of Soc. Sec.*, 181 F.3d 429, 435 (3d Cir. 1999); *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014).

## C. Weight of Dr. August's January 2012 Opinion

Plaintiff argues that the ALJ failed to accord proper weight to the opinion of Dr. August.  Pl. Brief at 15.   Substantial evidence does not support the ALJ's according little weight to Dr. August's opinion.   The ALJ gave Dr. August's opinion little evidentiary weight because:

> it [was] not supported by his contemporaneous treatment notes.  Dr. August noted during an office visit on January 27, 2012, that the claimant was happy, with a stable mood and affect.  He assigned her a [sic] GAF scores ranging between 42 and 60 from March 2011 through January 2012. Her low GAF scores were when she was not taking her medications or had recent physical altercations with her boyfriend. During examinations, Dr. August noted that the claimant was pleasant and cooperative and not irritable.  Her affect was full range and her mood was ok. Dr. August noted that her mood was upbeat and cheerful and described her as pleasant, calm, and cooperative. In sum, his clinical findings do not support his opinion.

(Tr. 22-23) (internal citations omitted).  The ALJ also determined that:

> [Dr. August's] clinical findings do not support his opinion. While [Plaintiff] reported during some office visits that she had violent outbursts, which involved her beating her boyfriend, this is not corroborated by any objective evidence. In light of the claimant's documented tendency to exaggerate her symptoms, her uncorroborated reports of violent behavior are questionable. As these

> violent episodes are the basis of Dr. August's opinion, the undersigned gives his opinion very little evidentiary weight.

(Tr. 23) (internal citations omitted).  The ALJ further reasoned that since Plaintiff's "only reported instances of violent outbursts have been against her boyfriend . . . there is no reason to believe that she would behave this way with other people." (Tr. 24).

An ALJ may point to inconsistencies between the physician's opinion and treatment record to credit one opinion over another, *Plummer v. Apfel*, 186 F.3d 422, 430 (3d Cir. 1999), but only if the treatment notes address ability to function in a work setting.  *See Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 356 (3d Cir. 2008).  When using internal inconsistencies to discredit a treating physician's report, the internal discrepancies must be truly contradictory.  *See Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 356 (3d Cir. 2008); *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000); *see also Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006).

The United States Court of Appeals for the Third Circuit in *Brownawell* found error where the ALJ rejected a consultative examiner's opinion on the basis that observations of the claimant at the time of an examination contrasted with an

ultimate opinion of the claimant's ability to work. *See Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 356 (3d Cir. 2008). The Third Circuit found that a doctor's statement that a claimant had "no ability to maintain attention or concentration" in the work setting was not contradicted by the observation during the examination that the claimant had "good focus, good attention, and good concentration." *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 356 (3d Cir. 2008). The Court in *Brownawell* explained that:

> [t]hese assessments are not necessarily contradictory, however, as one assessment was describing [the claimant's] condition at the time of . . . [the] examination and the other reflected [the doctor's] assessment of [the claimant's] ability to function in a work setting. As discussed supra, this Court has admonished ALJs who have used such reasoning, noting the distinction between a doctor's notes for purposes of treatment and that doctor's ultimate opinion on the claimant's ability to work.

*Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 356 (3d Cir. 2008). The Third Circuit also found that a doctor's observation that a claimant is "stable and well controlled with medication" during treatment does not contradict the opinion that the claimant's mental impairment rendered him markedly limited in a number of relevant work-related activities. *See Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000). The Third Circuit cautioned that a doctor's opinion that a claimant's ability

to function is seriously impaired or nonexistent in every area related to work "shall not be supplanted by an inference gleaned from treatment records reporting on the claimant in an environment absent of the stresses that accompany the work setting." *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000).

The ALJ reinterpreted the violence as a causal factor to Plaintiff's mental illness symptoms rather than accepting Dr. August's assessment that the violence was a symptom of Plaintiff's mental illness.[14] As such, the ALJ erroneously based his determination on his own lay interpretation of medical evidence. *See Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986); *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985); *see also Himes v. Comm'r of Soc. Sec.*, 585 F. App'x 758, 767 (11th Cir. 2014) (finding error where the ALJ's reinterpreted an impairment as a "temper problem" as opposed to a mental illness identified by physicians' opinions).

As discussed above, the ALJ's reliance on statements taken out of context from a March 1994 record was in error, thus the ALJ's discrediting Dr. August's

---

[14] The ALJ also contradicts himself by using "recent physical altercations with her boyfriend" to discredit Plaintiff's low GAF scores, yet doubting that the violence occurred in order to discredit Dr. August's January 2012 opinion as based on "questionable" "uncorroborated reports of violent behavior." *See* (Tr. 21, 23).

opinion based on a belief that Plaintiff has a "documented tendency to exaggerate her symptoms" (Tr. 23), is erroneous.  As with the ALJ's abovementioned error of discrediting uncontradicted evidence of assistance from Plaintiff's son, evidence of Plaintiff's violent outbursts is also uncontradicted.   In fact, treatment records reflect that paranoia, delusional symptoms, and violence often correlated to Plaintiff's medication lapses and resulted in violence against a boyfriend over a period of four years.

In January 2008, while Plaintiff reported that the current combination of medications worked, a former boyfriend described her as experiencing paranoia and Plaintiff described as "simple jealousy."  (Tr. 447).  Over two years later, in July 2010, Plaintiff reported still having "very severe violent outbursts" and that she hit her boyfriend the day of the report.  (Tr. 510).  Dr. August noted that Plaintiff continued to have problems with paranoia, had been having extreme mood swings, and experienced hallucinations recently.  (Tr. 510).  In September 2011, Dr. August observed that since Plaintiff had been on her medication, she has not had any hallucinations and delusions of jealousy regarding her boyfriend were completely resolved.  (Tr. 613).  In October 2011, it was noted that Plaintiff had

"some paranoid ideation, getting jealous when her boyfriend is at work and [would] get partially aggressive at times when she confront[ed] him." (Tr. 612). In December 2011, Plaintiff reported that she became paranoid, attacked her boyfriend and cut him under the eye. (Tr. 610). Plaintiff reported that she generally avoids seeing people and mostly remains at home. (Tr. 610). Plaintiff reported that she tends to get paranoid at work and run out of the building. (Tr. 610). Dr. August observed that Plaintiff continued to have a certain level of paranoid thinking. (Tr. 610). In January 2012, Plaintiff reported that she attacked her boyfriend over the weekend. (Tr. 609). Dr. August observed that Plaintiff had bruises on her right hand from having punched her boyfriend. (Tr. 609). While not experiencing hallucinations, Plaintiff did report severe paranoid thinking, that she continued to avoid people and rarely left her house. (Tr. 609).

Contrary to the ALJ's decision, Dr. August's January 2012 opinion is supported by clinical records which demonstrate a causal connection between instances of delusional or paranoid thinking and resulting violence. Moreover, Dr. August's objective observation of violence is evidenced by the bruising on Plaintiff's hands, and, is consistent with the lay statement submitted by Plaintiff's

boyfriend Mr. Stiles.   Based on the foregoing, substantial evidence does not support the ALJ's allocation of weight to Dr. August's January 2012 opinion.

### D. Discrediting of Lowest GAF Scores

Substantial evidence does not support the ALJ's decision to discrediting Plaintiff's low GAF scores.  The ALJ noted that Plaintiff's GAF scores "ranged from 30 to 65 which suggests [sic] that the severity of her symptoms and limitations fluctuates considerably."  (Tr. 15).  The ALJ concluded that Plaintiff's "GAF scores have generally been between 50 and 65, which suggests that she is able to perform her activities of daily living independently."  (Tr. 17).  The ALJ noted that in July 2010, Dr. August assigned the claimant a GAF score of 38, "however, [Plaintiff] was friendly and calm during mental status examination. She continued to have issues of paranoia and mood swings as evidenced by her violent outbursts with her boyfriend. By August 2010, her GAF score increased to 55." (Tr. 21) (internal citations omitted).  The ALJ further observed that Plaintiff had "GAF scores ranging between 42 and 60 between March 2011 through January 2012. Her low GAF scores were when she was not taking her medications or had

recent physical altercations with her boyfriend."   (Tr. 21, 23) (internal citation omitted).

The record demonstrates that Plaintiff was given the following GAF scores: 1) March 1994, GAF 30 (Tr. 384); 2) April 1994, GAF 40 (Tr. 385); 3) December 2007, GAF 50 (Tr. 408); 4) January 2008, GAF 65 (Tr. 447); 5) February 2008, GAF 60 (Tr. 445); 6) March 2008, GAF 50 (Tr. 443); 7) July 2008, GAF 58 (Tr. 474); 8) July 2010, GAF 38 (Tr. 510); 9) August 2010, GAF 55 (Tr. 508); 10) May 2011, GAF 44 (Tr. 614); 11) September 2011, GAF 60 (Tr. 613); 12) October 2011, GAF 55  (Tr. 612); 13) December 2011, GAF 49 (Tr. 610); and, 14) January 2012, GAF 42  (Tr. 609).   In January 2012, Dr. August opined that Plaintiff had marked limitations in her ability to function with others and respond to stress due to Plaintiff's schizoaffective disorder, bipolar type; post-traumatic stress disorder; and, her history of violently attacking her boyfriend, as evidenced by bruising on her fists.  (Tr. 573-74).

While the ALJ did address Plaintiff's low GAF scores, the reasons provided for discrediting them amount to error.  As discussed above regarding the ALJ's failure to weigh all evidence, the ALJ's discrediting the low GAF score based on a

lay interpretation of the significance that Plaintiff "was friendly and calm during mental status exam" is erroneous. *See Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986); *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).

Moreover, the ALJ erred by discrediting Plaintiff's low GAF scores based on a correlation with a failure to take medications without addressing whether Plaintiff's failure to take the medications was due to her mental illness. *See e.g.*, SSR 96-7p (stating that an adjudicator must not draw any inferences about an individual's symptoms from a failure to pursue regular medical treatment without first considering any explanations); *Pate-Fires v. Astrue*, 564 F.3d 935, 945-47 (8th Cir. 2009); *Mendez v. Chater*, 943 F.Supp. 503, 508 (E.D. Pa.1996) (citing *Sharp v. Bowen*, 705 F.Supp. 1111, 1124 (W.D. Pa.1989)). The ALJ also erred by discrediting Plaintiff's low GAF scores based, by substituting the judgment of the ALJ for that of a doctor as to whether the violent outbursts were due to Plaintiff's mental illness.

The United States Court of Appeals for the Eighth Circuit has observed that "federal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the 'result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (quoting *Mendez v. Chater*, 943 F.Supp. 503, 508 (E.D. Pa. 1996); *see also Robinson v. Barnhart*, 366 F.3d 1078, 1083-84 (10th Cir. 2004); *Hennion v. Colvin*, No. 3:13-CV-00268, 2015 WL 877784, at *24 (M.D. Pa. Mar. 2, 2015); *Sweeney v. Comm'r of Soc. Sec.*, 847 F. Supp. 2d 797, 807 n. 14 (W.D. Pa. 2012). The Eighth Circuit further observed that "[c]ourts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized psychological and emotional difficulties may deprive a claimant of the rationality to decide whether to continue treatment or medication." *Pate-Fires v. Astrue*, 564 F.3d 935, 945-46 (8th Cir. 2009) (internal quotation marks omitted). Courts have acknowledged that noncompliance with treatment is especially prevalent among patients with bipolar disorder.[15] *See e.g.*, *Kangail v. Barnhart*, 454 F.3d 627, 630-31 (7th Cir. 2006);

---

[15] Although the ALJ noted that Plaintiff alleged bipolar disorder as an impairment and mentioned different medical opinions addressing Plaintiff's bipolar disorder, the ALJ did not make a Step

*Sweeney v. Comm'r of Soc. Sec.*, 847 F. Supp. 2d 797, 807 n. 14 (W.D. Pa. 2012);

*Pounds v. Astrue*, 772 F. Supp. 2d 713, 723 n. 21 (W.D. Pa. 2011) (observing that

"non-compliance is a hallmark of bipolar disorder, particularly when the person is

in the manic phase"); *Howard v. Astrue,* 2010 WL 1372662, at *6 n. 2 (W.D.Okla.

Mar. 9, 2010) (noting that "[n]oncompliance with medication is a very common

feature among bipolar patients. Rates of poor compliance may reach 64% for

bipolar disorders, and noncompliance is the most frequent cause of recurrence.")

(internal quotations and citations omitted).  The United States Court of Appeals for

the Seventh Circuit has explained:

> [I]t is true that bipolar disorder is treatable by drugs. But mental
> illness in general and bipolar disorder in particular (in part because it
> may require a complex drug regimen to deal with both the manic and
> the depressive phases of the disease) may prevent the sufferer from
> taking her prescribed medicines or otherwise submitting to treatment.
> The administrative law judge did not consider this possibility.

*Kangail v. Barnhart*, 454 F.3d 627, 630-31 (7th Cir. 2006) (internal citations

omitted).[16]  In *Pate-Fires*, the Eighth Circuit determined that substantial evidence

---

Two finding as to whether it was considered a severe.  (Tr. 15).  Given that Plaintiff has not
raised the issue and the case will be remanded on other grounds, the Court need not address this
omission as the ALJ can address the evidence regarding Plaintiff's bipolar disorder on remand.

[16]  The Seventh Circuit also observed that "bipolar disorder can precipitate substance abuse, for
example as a means by which the sufferer tries to alleviate her symptoms. . . . the fact that

did not support an ALJ's determination that the plaintiff's noncompliance was due to her free will when doctors opined that her judgement and insight were impaired and she was suffering from '[v]ague and paranoid delusions;' the plaintiff stated that she did not like the side effects, and explained that she discontinued her medication because she felt that she did not need them. *Pate-Fires v. Astrue*, 564 F.3d 935, 946 (8th Cir. 2009).

The ALJ failed to acknowledge the role of Plaintiff's mental illness on her ability to consistently remain on medication. The record demonstrates that Plaintiff has a history of irrational thinking, paranoia, and auditory hallucinations. *See e.g.*, (Tr. 407). Even when Plaintiff takes her medications (which have often changed and dosage adjusted over the years) she is not completely free of the symptoms that would cause her not to take her medications. Plaintiff testified that her depression causes her to neglect to take medication, makes it difficult for her to get out of bed, and affects her motivation. (Tr. 49). Plaintiff also testified that since the recent increase in her medication dosage, she did not have hallucinations *as much as she used to*, however, she *still has delusions* about people and

---

substance abuse aggravate[s] [one's] mental illness does not prove that the mental illness itself is not disabling." *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006).

experiences anxiety when she is in public and crowded places.   (Tr. 49-50) (emphasis added).

In December 2007, although Plaintiff was taking medication and was able to sleep a little better and was not hearing voices, she still experienced "mild" paranoia.  (Tr. 407-408).  In February 2008, despite taking three tablets of 100 mg Trazodone at bedtime, Plaintiff was unable to fall asleep before 3:00 a.m. and when she slept, nightmares would awake her, resulting in her being tired during the day.   (Tr. 445).   Without any indication that Plaintiff was not taking her medication, Plaintiff reported that her mood was variable and the fluctuation was worse in the past two weeks.  (Tr. 445).  In September 2010, Plaintiff reported that her medication helped her with paranoid feelings, but that she still experienced nightmares.   (Tr. 513-514).   It was observed that she demonstrated some depression and Plaintiff was regarded as having "fair to poor" insight and judgment. (Tr. 513-514).

Other reasons explain Plaintiff's failure to take medication.   In January 2008, Plaintiff stated that she tried to follow the advice of her drug and alcohol counselor that she should wean herself off of psychiatric medications "because

they are a crutch just like alcohol." (Tr. 451).  The record demonstrates that Plaintiff experienced side effects. In July 2010 it was noted that Plaintiff required emergency treatment as a result to experiencing side effects to Lithium, and Dr. August discontinued the Lithium and started Plaintiff on Clozapine which required that she take routine blood tests to evaluate for side-effects.  (Tr. 510, 613-614). At the administrative hearing on May 31, 2012, Plaintiff testified that her medications make her tired, and she does not sleep well at night.  (Tr. 42).  In a treatment record from July 2008, Plaintiff reported a history of bulimia and anorexia and noted that she was eating only once per day.  (Tr. 472).  Plaintiff reported that while she had been prescribed psychotropic medications, she was not taking them at the time due to weight gain.  (Tr. 472).

In May 2011, Plaintiff reported that she had problems obtaining her medication due to a recent change in laboratories and blood test results not being forwarded to her pharmacy.  (Tr. 614).  Four months later, in September 2011, Plaintiff reported that her medication kept getting stopped because the requisite blood tests were not being sent.  (Tr. 613).  Dr. August noted that staff was working towards a solution regarding the "bureaucratic problems" interfering with

Plaintiff's access to Clozapine.  (Tr. 613).  In October 2011, Plaintiff reported that "there have been times where she has stretched the medications to last longer," and sometimes missed or only took a portion of the prescribed medication some nights. (Tr. 612).

The ALJ did not consider reasons as to why Plaintiff was not compliant with her medications and even when she complied, her symptoms remained.  Based on the foregoing, the Court finds that erred in discrediting Plaintiff's low GAF scores.

### E.  Rejection of Lay Statements

The ALJ erred by rejecting the lay statements from Ms. Powers (Tr. 340) and Mr. Stiles (Tr. 343) on the basis that the statements were not "medical opinions from treating sources."  (Tr. 21).

Observations of a plaintiff made in third party lay statements are valid sources for an ALJ to consider.  *E.g.*, 20 C.F.R. § 404.1513(e)(2); SSR 06-03p; SSR 96-7p; *see e.g.*, SSR 13-2p (question 6(b), question 8(c)(ii)) (discussing the relevance of "'other' non-medical" sources such as family and friends).[17]  Social Security Ruling 06-03p, states that:

---

[17] Social Security Rulings become effective upon publication, and the effective date of SSR 13-2p is March 22, 2013.  Although SSR 13-2p (which superseded SSR 82-60) was not binding on

[W]e may use evidence from "other sources," as defined in 20 CFR 404.1513(d) and 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function. These sources include, but are not limited to . . . Spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. . . . [I]nformation from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

. . . .

In considering evidence from "non-medical sources" who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors, it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence.

SSR 06-03p; *accord Zirnsak v. Colvin*, 777 F.3d 607, 612-13 (3d Cir. 2014).

Additionally, Social Security Ruling 96-7p, states that:

Other sources may provide information from which inferences and conclusions may be drawn about the credibility of the individual's statements. Such sources may provide information about the seven factors listed in the regulations and may be especially helpful in establishing a longitudinal record. Examples of such sources include . . . nonmedical sources such as family and friends.

---

the ALJ at the time the original administrative decision, given that the case will be remanded on other grounds, the Court finds the ruling instructive.

SSR 96-7p.  It is error for the ALJ to disregard these third party statements on the basis that such statements were not from medical sources.  *See* SSR 06-03p; *Zirnsak v. Colvin*, 777 F.3d 607, 612-13 (3d Cir. 2014).

## F.  Remaining issues

Because Plaintiff's case will be remanded for the ALJ's failure to further development and to consider and analyze all relevant medical evidence regarding her mental impairments, including her low GAF scores, it is unnecessary to examine Plaintiff's remaining claims.  A remand may produce different results on these claims, making discussion of them moot.  *See LaSalle v. Comm'r of Soc. Sec.*, No. CIV.A. 10-1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

///

///

///

///

///

///

///

## IV.     Conclusion

Based on the foregoing, the Court finds that the ALJ's decision lacks substantial evidence.     Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order in accordance with this Memorandum will follow.

Dated: July 13, 2015                                   *s/Gerald B. Cohn*
                                                      GERALD B. COHN
                                          UNITED STATES MAGISTRATE JUDGE